Offering Memorandum
July 31, 2005 as amended

**FINVEST PRIMER, LP**

244 Madison Avenue, Suite # 738
New York, New York 10016

Tel: (866) 551-7172
Fax: (212) 401-4786

LIMITED PARTNERSHIP INTERESTS
Minimum Investment – $500,000

---

Finvest Primer, L.P. (the "Partnership") is a Delaware limited partnership which seeks above average capital appreciation with a low correlation to the S&P 500 and NASDAQ 100 Indexes. It invests primarily in long and short positions in equity securities traded in the U.S. markets, and in options on such securities. A core investment strategy of the Partnership is to write out-of-the-money put options. It also may use margin borrowings to leverage its returns.

Finvest Asset Management, LLC is the General Partner of the Partnership. Its investment process is opportunistic and concentrates on achieving maximum appreciation through active and aggressive trading strategies. Investment in the Partnership therefore involves substantial risk and may be considered speculative.

---

THE LIMITED PARTNERSHIP INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW, AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF BY AN INVESTOR WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

---

This Offering Memorandum has been prepared in connection with the private placement of Limited Partnership Interests of the Partnership and does not constitute an offer or solicitation by anyone in any jurisdiction in which such an offer or solicitation is not authorized or in which the making of such an offer or solicitation would be unlawful. This Offering Memorandum constitutes an offer only if a name and offering memorandum number appear below.

_____           _____
Name of Offeree                                     Offering Memorandum Number

## TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY OF THE OFFERING MEMORANDUM | 2 |
| INVESTMENT OBJECTIVES AND POLICIES | 4 |
| Investment Strategy | 4 |
| Equity Securities | 4 |
| Foreign Securities | 5 |
| Short Sales | 5 |
| Options | 5 |
| Leverage | 6 |
| Short-Term Investments | 6 |
| Portfolio Transactions | 6 |
| BROKERAGE AND TRANSACTIONAL PRACTICES | 6 |
| General Selection Criteria | 7 |
| Soft Dollars | 7 |
| Aggregation of Orders | 8 |
| "Prime Brokerage," Custody, Clearing and Settling | 8 |
| THE PARTNERSHIP | 9 |
| Management | 9 |
| Management Fee | 9 |
| Incentive Allocation | 9 |
| Expenses | 9 |
| Service Providers | 9 |
| Extraordinary Expenses | 9 |
| Distributions | 10 |
| WHO SHOULD INVEST; SUBSCRIPTIONS AND WITHDRAWALS | 11 |
| Selling Commission | 11 |
| Eligible Participants | 11 |
| Foreign Investors | 12 |
| How to Subscribe | 12 |
| Withdrawals | 12 |
| Mandatory Withdrawals; Expulsion of a Limited Partner | 13 |
| Transferability of the Interests | 13 |
| THE PARTNERSHIP AGREEMENT | 14 |
| Powers of the General Partner | 14 |
| Liability of Limited Partners | 14 |
| Liability of General Partner | 14 |
| Allocation of Net Profits and Net Losses | 14 |
| Calculation of Asset Value | 14 |
| Special Allocation of Profits or Losses from "Hot Issues" | 14 |
| Dissolution and Termination | 15 |
| CERTAIN RISK CONSIDERATIONS | 15 |
| General | 15 |
| Risks of Equity Investments | 15 |
| Concentration of Investments | 15 |
| Short Sales | 15 |
| Put Writing | 15 |
| Borrowing | 16 |
| Special Option Considerations | 16 |
| Brokerage Commissions/Transaction Costs | 16 |
| Insolvency of Brokers and Others | 16 |
| Effect of Substantial Withdrawals | 16 |
| Illiquidity of Limited Partnership Interests | 16 |
| Withdrawal Payments in Kind | 16 |
| Dependence on Mr. Grieve | 16 |
| Absence of Regulation | 17 |
| Performance-Based Incentive Arrangements | 17 |
| Potential Conflicts of Interest | 17 |
| Required Withdrawal of a Limited Partner | 17 |
| Early Termination of Partnership | 17 |
| Tax Treatment as a Partnership | 17 |
| CERTAIN TAX CONSIDERATIONS | 18 |
| General | 18 |
| Classification of the Partnership | 18 |
| Allocation of Profits and Losses | 18 |
| Limitation on Deductibility of Investment Expenses | 18 |
| Inapplicability of Passive Activity Loss Provisions | 19 |
| Tax-Exempt Organizations | 19 |

| | |
|---|---|
| Tax-Exempt Organizations………………………………………………………………………………. | 19 |
| Annual Tax Information……………………………………………………………………………….. | 19 |
| State and Local Taxation……………………………………………………………………………….. | 19 |
| CERTAIN ERISA CONSIDERATIONS…………………………………………………………….. | 19 |
| General………………………………………………………………………………………………….. | 19 |
| Investment Considerations…………………………………………………………………………….. | 19 |
| Plan Assets………………………………………………………………………………………………. | 20 |
| Considerations for Non-Plan Investors……………………………………………………………….. | 20 |
| ADDITIONAL INFORMATION……………………………………………………………………….. | 21 |
| Reports to Limited Partners……………………………………………………………………………. | 21 |
| Custody of Partnership Assets………………………………………………………………………… | 21 |
| Independent Accountants……………………………………………………………………………… | 21 |
| Counsel…………………………………………………………………………………………………. | 21 |
| Other Information……………………………………………………………………………………… | 21 |
| Appendix A: Form of Partnership Agreement………………………………………………………… | A-1 |
| Appendix B: Confidential Investor's Questioner and Subscription…………………………………. | B-1 |
| Appendix C: Request for Redemption………………………………………………………………… | C-1 |

Any reproduction or distribution of this Offering Memorandum, in whole or in part, by any person other than the recipient from the Partnership, is prohibited. By accepting this Offering Memorandum, the recipient agrees to return the same promptly in the event of a decision not to make an investment in the Partnership.

EDGE-E-0000962

## SUMMARY OF THE OFFERING MEMORANDUM

THIS SUMMARY IS FOR CONVENIENCE ONLY AND DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE INFORMATION CONTAINED IN THE OFFERING MEMORANDUM.

**Partnership:** Finvest Primer, L.P. is a Delaware limited partnership.

**Investment Objectives:** The Partnership's investment objective is above average capital appreciation with a low correlation to the S&P 500 and NASDAQ 100 Indexes. It invests aggressively both long and short, primarily in equity securities traded in the U.S. markets and in options on such securities. A core investment strategy of the Partnership is to write out-of-the-money puts, accrue premium on the puts for the account and benefit of the Partnership, and allow the puts to expire worthless through the natural decay of premium over time. The Partnership may also use margin borrowings to leverage its returns. At any time the Partnership may be fully invested and may be 100% (or more) net long or as much as 100% net short. Portfolio turnover rates may vary from year to year and at different times during the same year, and will be relatively high.

The Partnership Agreement does not limit the types of positions the Partnership may take, the concentration of its investments (by sector, industry, capitalization, company, or asset class), or the number or extent of its short positions. The Partnership will make a wide variety of investments, including not only common stocks and options, but also other related derivative investments, preferred stocks, and cash equivalents. The General Partner attempts to limit the volatility of the Partnership's portfolio by diversification, use of short sales and option investments.

**General Partner:** Finvest Asset Management, LLC is the General Partner of the Partnership.

**Allocations of Profits and Losses:** The profits and losses of the Partnership for each accounting period are allocated to the Partners *pro rata* in proportion to the values of their capital accounts at the beginning of the period, subject to the General Partner's incentive allocation described below.

The profits and losses for any period will reflect unrealized profits and losses on the value of the Partnership's assets during the period, as well as realized capital gains and losses, dividends, and interest during the period.

**Fees and Expenses:** The Partnership bears all expenses of its organization and operation, including management fees, expenses incurred in the purchase and sale of its investments, legal expenses, and accounting fees, as determined by the General Partner.

**Incentive Fee:** The General Partner receives an annual management fee equal to 1.75% of each Limited Partner's capital account, payable quarterly in arrears. Contributions during a quarter are subject to a prorated management fee. The General Partner also receives an incentive allocation at the end of each calendar quarter equal to 20% of the net capital appreciation of each Limited Partner's capital account during such quarter. The incentive allocation is payable only if, and to the extent that, the net capital appreciation of a Limited Partner's capital account for the quarter exceeds any net capital depreciation accumulated in prior quarters. If a Limited Partner withdraws all or a portion of its capital account on a date other than the last day of a calendar quarter, an incentive allocation will be made on the amount withdrawn for the period from the end of the preceding quarter to the date of withdrawal.

**Withdrawal Rights:** A Limited Partner may withdraw all or any part of his or her capital account balance from the Partnership as of the end of any calendar quarter, by giving at least 30 days prior written notice to the Partnership. A continuing Limited Partner must maintain a minimum capital account of $500,000 (or such lesser amount as may be permitted by the General Partner).

The General Partner may require any Limited Partner to withdraw from the Partnership, or reduce his or her Interest in the Partnership, at any time.

When a Limited Partner withdraws entirely from the Partnership, 10% of the amount withdrawn may be retained up to 120 days until final reconciliation of the Partnership's net asset value. The Partnership may pay all or a portion of any withdrawal by distribution of portfolio securities up to 120 days until final reconciliation of the Partnership's net asset value.

2

| | |
|---|---|
| **Transaction Fee** | A fee may be charged to a Limited Partner in connection with substantial capital contributions or withdrawals by the Limited Partner, to ensure that the portfolio transaction costs incurred in connection with the investment or disposition of portfolio securities will be allocated to the Limited Partner. |
| **Term:** | The Partnership will terminate on December 31, 2051, but may be terminated sooner under certain circumstances such as the withdrawal of the General Partner. |
| **Risk Factors:** | Investment in the Partnership involves significant risk factors. The Partnership is newly organized and has no operating history, and no assurance exists that it will achieve its investment objective. In addition to the risks always associated with investment in equity securities, the General Partner's investment strategies involve a variety of other risks. Potential investors should carefully consider the information under "Who Should Invest; Subscriptions and Withdrawals," "Certain Risk Considerations" and "Taxation." |
| **The Offering:** | The Partnership conducts a continuing offering of Limited Partnership Interests, which are sold to up to 100 investors. The Partnership accepts as Limited Partners only "accredited investors" (as that term is defined in Regulation D under the Securities Act of 1933, as amended) who are "qualified clients" (as that term is defined in Rule 205-3 under the Investment Advisers Act of 1940, as amended), and who invest at least $500,000 in the Partnership (subject to such exceptions as the General Partner permits). The entire subscription payment for Partner's Interest is due in full at the time of execution of the Subscription Agreement. See "Terms of the Offering." The General Partner reserves the right to terminate this Offering at any time. After admission to the Partnership, a Limited Partner may make additional purchases of Interests of at least $500,000 (subject to such exceptions as the General Partner permits). The Partnership reserves the right to reject any subscription for Limited Partnership. |
| | The Partnership does not accept any investment from any entity that is a "benefit plan investor" within the meaning of 29 C.F.R. Section 2510.3-101(f) ("Benefit Plan Investor") if, as a result, 25% or more of the value of any class of equity interests in the Partnership would be held by Benefit Plan Investors (excluding for the purposes of this determination the value of any equity interests held by the General Partner, or any other person (other than a Benefit Plan Investor) that has any discretionary authority or control with respect to the assets of the Partnership or provides investment advice for a fee with respect to such assets, or any affiliate of any such person). |
| **Reports** | Limited Partners will receive audited annual financial statements and quarterly account reports prepared by the Partnership. |
| **Taxes** | The Partnership does not expect to be subject to Federal income tax. Potential investors should consult their own advisors about the tax consequences of investing in the Partnership. See "Certain Tax Considerations." |
| **Term of Partnership** | The Partnership will terminate on December 31, 2051, but may be terminated sooner under certain circumstances such as the withdrawal of the General Partner. |
| **Accountants:** | Deloitte, Touche or an independent firm of public auditors for the partnership's particular practice. |
| **Counsel:** | An independent attorney for the partnership's general and particular practice. |
| **Prime Broker:** | Morgan Stanley Prime Brokerage, or a Prime Broker as appointed by the General Partner. |
| **Back Office Accounting and Administration:** | Global Hedge Fund Administration, or as appointed by the General Manager. |

3

## INVESTMENT OBJECTIVES AND POLICIES

The Partnership's investment objective is above average capital appreciation with a low correlation to the Standard & Poor's 500 and NASDAQ 100 Stock Indexes. It invests aggressively both long and short, primarily in equity securities traded in the U.S. markets, and in options on such securities. A core investment strategy of the Partnership is to write out-of-the-money put options, accrue premium on the put options for the account and benefit of the Partnership, and allow the put options to expire worthless through the natural decay of premium over time.

The Partnership may also use margin borrowings to leverage its returns. At any time the Partnership may be fully invested and may be 100% (or more) net long or as much as 100% net short. Portfolio turnover rates may vary from year to year and at different times during the same year, and will be relatively high.

The Partnership Agreement does not limit any of (a) the types of positions the Partnership may take; (b) the concentration of its investments (by sector, industry, capitalization, company, or asset class), or (c) the number or extent of its short positions. The Partnership Agreement permits a wide range of investments, including not only common stocks and options, but also other related derivative instruments, preferred stocks, and cash equivalents.

The General Partner's investment process is opportunistic, and concentrates on achieving maximum appreciation through active and aggressive trading strategies. The General Partner attempts to limit the volatility of the Partnership's portfolio by diversification among issuers and industry sectors, and by option investments. However, the Partnership's portfolio will be subject to fluctuations in value. Investment in the Partnership therefore involves substantial risk and may be considered speculative.

**Investment Strategy**

The General Partner's core investment strategy is to write out-of-the-money put options. The intention of managing a portfolio which consists of primarily short positions in put options is to create the synthetic equivalent of a portfolio which reflects long stock positions with a hedge. The amount of the hedge should ostensibly equal the extent to which the portfolio or single short put-option position is out-of-the-money.

Under normal conditions, the General Partner expects to commit approximately 90% or more of the Partnership's assets to write or secure 70-500 put option short positions it believes will expire worthless in the course of time.

The General Partner uses proprietary technologies to screen technical factors of more than 10,000 equity securities daily for potential investments. These technical factors include the measure of returns on invested capital, balance sheet quality, technical analysis, and relative valuation levels. Potential investments which trade at a discount based on the General Partner's equity valuation model are then analyzed further for more subjective and judgmental factors, such as sustainable growth, quality business model, superior management, and a company or industry-wide catalyst that will move the underlying stock price of an option up within 1-3 months. Additional technical factors, such as price volatility and market money flows, are considered to determine the appropriate time for investment in a security or in writing a put option.

The trading model may be enhanced through long and short positions in equity securities, traded in U.S. markets.

The General Partner actively manages the portfolio's positions, through constant monitoring of the factors that resulted in each transaction and evaluation of alternative positions.

The Partnership's option trading is based on the General Partner's proprietary dynamic hedging System. This System attempts to protect the Partnership's positions and increase returns – whether market prices in general are rising, decreasing or flat. Additionally, the system seeks to increase Partnership returns by capturing option time premiums in up, down, and non-directional market conditions. Margin maintenance for option positions will generally range from 10%-25% of total Partnership assets.

The General Partner seeks to manage the portfolio's overall risk through its stock selection and sale criteria, active hedging, and use of leverage and diversification to reduce market correlation. The types of securities in which the Partnership invests, as well as its strategies and investment techniques, are discussed further below.

**Equity Securities**

The Partnership may invest in common stock of companies, generally with prices between $5 and $90 per share. There is no limitation on the types of publicly traded equity securities in which the Partnership may invest if the General Partner believes they present opportunities for capital appreciation. Its investments may include, but are not limited to include, common stock of issuers ranging in size from "large-cap" companies represented in the Standard & Poor's 500 Stock Index to "small-cap" companies with market capitalizations normally in excess of $250 million, and may include preferred stocks. These securities may be traded on major stock exchanges, the NASDAQ National Market System, or regional stock exchanges and must meet liquidity criteria (usually at least 100,000 shares per day in trading volume).

Under normal market conditions, the General Partner attempts to diversify the Partnership's equity investments among a number of issuers (no more exposure than 10% of total assets in any one position) and industries (no more exposure than 30% of total assets in any one industry). However, there is no limit on the percentage of the Partnership's assets that may be invested in any security or industry, and its portfolio may be concentrated in securities issued by a small number of issuers or companies in a small number of industries.

**Foreign Securities**

The Partnership may invest in securities of companies organized outside the United States and traded in U.S. securities markets.

**Short Sales**

The Partnership may make short sales of securities which the Partnership owns or has the right to acquire at no added cost through conversion or exchange of other securities it owns (referred to as short sales "against the box"), and may also make short sales of securities which it does not own or have the right to acquire. The Partnership will make short sales to hedge against a decline in the market price of securities that it holds or intends to buy, or to attempt to increase the Partnership's total return.

In a short sale "against the box," the Partnership would not immediately deliver the securities sold and would not receive the proceeds from the sale. The Partnership is said to have a short position in the securities sold until it delivers the securities sold, at which time it receives the proceeds of the sale. The decision to make a short sale "against the box" may be a technique to hedge against the market risks when the General Partner believes that the price of a security may decline, causing a decline in the value of a security owned by the Partnership or a security convertible into or exchangeable for such security. In such case, any future losses in the Partnership's long position would be reduced by a gain in the short position.

A short sale that is not made "against the box" is a transaction in which the Partnership sells a security it does not own in anticipation of a decline in market price. When the Partnership makes a short sale, the proceeds it receives are retained by the broker until the Partnership replaces the borrowed security. In order to deliver the security to the buyer, the Partnership must arrange through a broker to borrow the security and, in so doing, the Partnership becomes obligated to replace the security borrowed at its market price at the time of replacement, whatever that price may be.

**Options**

The Partnership may, when the General Partner believes conditions warrant, purchase and sell put and call options for hedging purposes or capital appreciation with respect to securities which the Partnership owns or which are otherwise eligible for purchase by the Partnership and with respect to the Standard & Poors 500 Stock Price Index or similar industry or sector indices. It may also use straddles, spreads and other combinations of put and call options for trading and hedging purposes.

A "put" gives a holder the right, in return for the premium paid, to require the writer of the put to purchase from the holder a security at a specified price. A "call" gives a holder the right, in return for the premium paid, to require the writer of the call to sell a security to the holder at a specified price. An option on a securities stock gives the holder the right, in return for the premium paid, to require the writer to pay cash equal to the difference between the closing price of the stock and the exercise price of the option, expressed in dollars, times a specified multiplier.

Put and call options are derivative securities traded on U.S. exchanges, including the American Stock Exchange, Chicago Board Options Exchange, Philadelphia Stock Exchange, Pacific Stock Exchange and New York Stock Exchange. Additionally, the Partnership may purchase dealer options that are not traded on a securities exchange.

The Partnership may also write (sell) uncovered listed put options.

Call options written by the Partnership give the holder the right to buy the underlying securities from the Partnership at a stated exercise price; put options written by the Partnership give the holder the right to sell the underlying security to the Partnership. A call option is covered if the Partnership owns the security underlying the call or has an absolute and immediate right to acquire that security without additional cash consideration upon conversion or exchange of securities currently held by the Partnership. A put option is covered if the Partnership maintains cash or cash equivalents equal to the exercise price in a segregated amount with its Custodian. If an option written by the Partnership expires unexercised, the Partnership realizes a gain equal to the premium received at the time the option was written. If an option purchased by the Partnership expires unexercised, the Partnership realizes a capital loss equal to the premium paid.

Each option has a "time value," which is the difference between the price for which the option is trading and the amount, if any, that the option is "in the money" (i.e., the excess of the call price over the price of the underlying security, or the excess of the price of the underlying security over the put price). The time value represents the market's valuation of the prospects for change in the amount the option will be in or out of the money on the date the option expires. As the expiration date of the option approaches, this time value shrinks to zero.

Prior to the earlier of exercise or expiration, an option written by the Partnership may be closed out by an offsetting purchase or sale of an option. The Partnership will realize a gain from a closing purchase transaction if the cost of the closing transaction is less than the premium received from writing the option; if it is more, the Partnership will realize a capital loss.
If the premium received from a closing sale transaction is more than the premium paid to purchase the option, the Partnership will realize a gain; if it is less, the Partnership will realize a loss.

5

The Partnership may also employ certain combinations of put and call options. A "straddle" involves the purchase of a put and call option on the same security with the same exercise prices and expiration dates. A "strangle" involves the purchase of a put option and a call option on the same security with the same expiration dates but different exercise prices. A "spread" involves the sale of an option and the purchase of the same type of option (put or call) on the same security with the same or different expiration dates and different exercise prices.

The Partnership may, at the same time it employs certain combination of options, also have a position in the underlying security, and a holding of segregated collateral as part of its "coverage" of short options. Thus, the Partnership's entire position related to a particular security or index may be complex.

**Leverage**

The Partnership will leverage its investments by buying securities on margin (i.e., with credit supplied by the broker-dealer through which equity securities are purchased). Under current regulations, the Partnership may obtain margin for up to 50% of the price of the securities it purchases. The General Partner limits the extent of the Partnership's borrowing based on its view of macro-economic factors, and generally obtains the maximum margin only when it believes such factors indicate sustained market advances.

**Short-Term Investments**

Under normal market conditions, the Partnership generally maintains at least 5% of its assets in money market funds, U.S. Government securities, or other cash equivalent investments, pending investment in other securities or for purposes of liquidity. In addition, during periods when the General Partner believes that acceptable investments are not available, or under unusual market conditions, a substantial portion (or all) of the Partnership's assets may be temporarily invested in such securities.

**Portfolio Transactions**

There is no predetermined limit to the Partnership's annual portfolio turnover rate, which is likely to vary from year to year and at different times during the same year, and may exceed 100%. A high rate of portfolio turnover will result in the Partnership paying greater brokerage commissions on equity securities (other than those effected with dealers on a principal basis) than would otherwise be the case, which will be borne directly by the Partnership and ultimately by its Limited Partners. High portfolio turnover may also result in the realization of net capital gains, and any distributions derived from such gains may be ordinary income for federal tax purposes.

EDGE-E-0000967

## BROKERAGE AND TRANSACTIONAL PRACTICES

The General Partner will have complete discretion in deciding what brokers and dealers the Partnership will use and in negotiating rates of brokerage compensation. In addition to using brokers as "agents" and paying commissions, the Partnership may buy or sell securities directly from or to dealers acting as principal at prices that include markups or markdowns.

**General Selection Criteria**

In choosing brokers and dealers, the General Partner will not be required to consider any particular criteria. For the most part, the General Partner will seek the best combination of brokerage expenses and execution quality but, as discussed below, the General Partner is not required to select the broker or dealer that charges the lowest transaction cost, even if that broker provides execution quality comparable to other brokers or dealers. In evaluating "execution quality," historical net prices (after markups, markdowns or other transaction-related compensation) on other transactions will be a principal factor, but other factors will also be relevant, including the execution, clearance, and settlement and error correction capabilities of the broker or dealer generally and in connection with securities of the type and in the amounts to be bought or sold; the broker's or dealer's willingness to commit capital; its reliability and financial stability; the size of the transaction; the availability of securities to borrow for short sales; and the market for the security.

**Soft Dollars**

In addition to execution quality, the General Partner may consider the value of various services or products, beyond execution, that a broker-dealer provides to the Partnership or the General Partner. Selecting a broker dealer in recognition of such other services or products is known as paying for those services or products with "soft dollars." Because many of those services could benefit the General Partner, it may have a conflict of interest in allocating the Partnership's brokerage business.

Under Section 28(e) of the Securities Exchange Act of 1934, the General Partner's use of the Partnership's commission dollars to acquire "research" products and services is not a breach of the General Partner's fiduciary duty to the Partnership – even if the brokerage commissions paid are higher than the lowest available -- as long as (among certain other requirements) the General Partner determines that the commissions are reasonable compensation for both the brokerage services and the research acquired. For these purposes, "research" means services or products used to provide lawful and appropriate assistance to the General Partner in making investment decisions for its clients.

The types of "research" the General Partner may acquire include reports on or other information about particular companies or industries; economic surveys and analyses; recommendations as to specific securities; financial publications; portfolio evaluation services; financial database software and services; computerized news, pricing and order-entry services; quotation equipment and other computer hardware for use in running software used in investment decision making; and other products or services that may enhance the General Partner's investment decision making. The Section 28(e) "safe harbor" applies to the use of Partnership soft dollars even when the research acquired is used in making investment decisions for clients other than the Partnership. The safe harbor is not available for transactions effected on a principal basis, with a markup or markdown paid to the broker-dealer, other than certain riskless principal transactions. And it is not available for the services or products that do not constitute research.

Payments of soft dollars outside the Section 28(e) safe harbor do not necessarily involve a breach of fiduciary duty, and the Partnership Agreement authorizes the General Partner to acquire some services and products without complying with Section 28(e) conditions. For example, the Partnership may compensate its prime broker for record keeping, custodial, and related services to the Partnership through brokerage compensation. And the Partnership may effect transactions with market makers on a principal basis in recognition of such market makers provision of services or products used in connection with Partnership activities.

The General Partner may also use Partnership soft dollars to pay expenses that the General Partner would otherwise have to bear or that otherwise provide benefits to the General Partner. Those expenses include office rent, the salaries, benefits and other compensation of employees or of consultants to the General Partner, telephone charges, and office services, equipment and supplies. The General Partner may or may not use other clients' soft dollars to pay such expenses and, if it does, such use may not be directly proportionate to the benefits to the Partnership and such other clients.

A broker or dealer through which the General Partner wishes to use soft dollars may establish "credits" relating to brokerage commissions paid in the past, which may be used to pay, or reimburse the General Partner for, specified expenses. In other cases, a broker or dealer may provide or pay for the service or product and suggest a level of future business that would fully compensate the broker or dealer. The Partnership's actual transactional business with such a broker-dealer may be less than the suggested level but can -- and often will -- exceed that level. This may be in part because the Partnership's investment activities generate aggregate commissions in excess of the aggregate suggestions from all broker-dealers providing services and products. And it may be in part because those broker-dealers may also provide superior execution and may therefore be most appropriate for particular transactions. Broker-dealers are not excluded from Partnership business simply because they have not provided research or other services or products.

EDGE-E-0000968

In addition to the factors described above, the General Partner may consider a broker-dealer's referrals of investors to the Partnership or the potential for future referrals. As with soft dollar payments for research, in some cases the transaction compensation paid might be higher than that obtainable from another broker-dealer who did not provide (or undertake to provide) referrals, although the General Partner will seek to avoid such a result and will generally seek "best execution." Awarding transaction business to broker-dealers in recognition of past or future referrals may involve an incentive for the General Partner to cause the Partnership to effect more transactions than it might otherwise do in order to stimulate more referrals.

**Aggregation of Orders**

The General Partner may combine orders on behalf of the Partnership with orders for other accounts for which has trading authority or in which he has an economic interest. In such cases, the General Partner will allocate the securities or proceeds arising out of those transactions (and the related transaction expenses) on an average price basis among the various participants. While the General Partner believes combining orders in this way will, over time, be advantageous to all participants, in particular cases the average price could be less advantageous to the Partnership than if the Partnership had been the only account effecting the transaction or had completed its transaction before the other participants. Because of the General Partner's relationship with the Partnership, if the General Partner were to advise certain types of clients, there could be circumstances in which the Partnership's transactions may not, under certain laws and regulations, be combined with those of some of the General Partner's other clients, and the Partnership may obtain less advantageous execution than such other clients.

**"Prime Brokerage," Custody, Clearing and Settling**

The Partnership may enter into a "prime brokerage" arrangement with Morgan Stanley Prime Brokerage (the "Prime Broker"), or any other nominated broker. Under this arrangement, the Prime Broker will provide certain record keeping services and perform the following functions, among others: arrange for the receipt and delivery of securities bought, sold, borrowed, and loaned; make and receive payments for securities; maintain custody of cash and securities; deliver cash to the Partnership's bank accounts; and tender securities in connection with tender offers, exchange offers, mergers, or other corporate reorganizations.

The Partnership may pay for custodial and related services either in cash or by allocating a portion of its brokerage business to the Prime Broker. The Partnership is not committed to continue its "prime brokerage" relationship with the Prime Broker for any minimum period, and may use one or more other prime brokers or custodians in the future. If the Partnership uses another prime broker or custodian, it may be required to pay separate fees in cash.

The Partnership will retain a professional accounting, auditing, or back-office management firm, to serve as an independent representative, to the General Partner and its affiliates. The General Partner may change the independent representative at any time by written notice. The Partnership's agreement with the Prime Broker does not confer on any investor or any other third party any rights or benefits and the Prime Broker has not, by entering into that agreement with the General Partner, assumed any duty or obligation to any investor or other third party.

The General Partner or respective agent, may receive a commission or service fee from a financial institution or similar entity, for services rendered in securing a loan for the Partnership to facilitate financial leverage.

8

## THE PARTNERSHIP

The Partnership is a Delaware limited partnership.

**Management**

The General Partner of the Partnership is Finvest Asset Management, LLC, which is primarily owned by Gad Grieve.

Mr. Grieve is the founder, a Managing Member and Chief Executive Officer of the General Partner. He received his Bachelor of Commerce in Accounting and Economics from the University of Cape Town, South Africa. Mr. Grieve is conversant with Portfolio Theory and the application of Risk and Reward Analysis. Additionally, he has experience in portfolio management. Gad Grieve is versed in risk management, deterministic and stochastic modeling, and effectively applies his talents in the area of fund management for Finvest.

The General Partner, at its own expense, may employ an unlimited number of fund managers and researchers to achieve its task of managing the Partnership.

The General Partner has exclusive control over the operation of the Partnership, including authority to manage the Partnership's investments, admit and expel Limited Partners, and terminate the Partnership. The Limited Partners will not participate to any extent in the management of the Partnership. Mr. Grieve intends to devote as much time as he deems necessary in promoting the successful conduct of the Partnership's business.

**Management Fee**

The General Partner will receive a quarterly management fee from each Limited Partner payable in arrears at the rate of 0.4375% (1.75% on an annualized basis) of the Limited Partner's capital account as of the end of each calendar quarter. This fee is paid quarterly by deduction from each Limited Partner's capital account, unless other payment arrangements are made with the General Partner.

**Incentive Allocation**

The General Partner will also receive, following the end of each calendar quarter, an incentive allocation from each Limited Partner of 20% of the net capital appreciation (i.e., capital appreciation less capital depreciation and any accumulated net capital depreciation carried forward from prior periods) of the Limited Partner's capital account. The incentive allocation is paid by reallocation to the General Partner on the last day of each calendar quarter of a portion of the Limited Partner's capital account balance. If a Limited Partner withdraws all or a portion of his or her capital account balance from the Partnership on a date other than the last day of a calendar quarter, an incentive allocation will be made on the amount withdrawn with respect to the period from the last day of the preceding quarter to the date of withdrawal.

**Expenses**

The Partnership bears all expenses of its organization and operation, (which will be amortized over a period of two years) including management fees, expenses incurred in the purchase and sale of its investments, founding costs, legal expenses, and accounting fees, or other related costs.

**Service Providers**

The Partnership may retain professional firms to perform certain continuing services for the Partnership and its Limited Partners (the "Service Providers"). The Service Providers may include Additional Selling Agents or other firms that employ persons who have participated in the Partnership's offering. The Service Providers will perform ongoing services for the Partnership and its Limited Partners. Such services include (i) responding to inquiries of the Limited Partners from time to time as to the value of their investment; (ii) providing information to the Limited Partners concerning the Partnership's activities; (iii) responding to inquiries of the Limited Partners related to the Partnership's account statements, annual reports and financial statements provided periodically to the Limited Partners; (iv) providing information to the Limited Partners regarding redemptions of Partner's Interest; (v) assisting the Limited Partners in redeeming Partner's Interest; and (vi) providing other services requested from time to time by the Limited Partners and the Partnership.

*For performing such ongoing services, a Service Provider will receive a service fee from the General Partner or a brokerage firm, not from the Partnership.*

All or a portion of such fees paid to a Service Provider may be remitted to its employees who provide such services to the Partnership and its Limited Partners; certain of these employees may have participated in the offering as registered representatives of the Additional Selling Agents.

**Extraordinary Expenses**

9

        The Partnership will also pay its extraordinary expenses, if any. Extraordinary expenses are unanticipated expenses that might arise from the Partnership's business activities, such as, for example, the cost of any litigation in which the Partnership might be engaged. By their nature, the dollar amount of extraordinary expenses cannot be estimated and may be substantial.

**Distributions**

        The Partnership does not expect to make distributions to its Limited Partners.

EDGE-E-0000971